IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| KANEISHA BIRD; O.M. (a minor),<br><br>　　　　　Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA, acting by and through the Bureau of Indian Affairs,<br><br>　　　　　Defendant.<br>_____<br>UNITED STATES OF AMERICA,<br><br>　　　　　Counter-Claimant,<br><br>vs.<br><br>KANEISHA BIRD,<br><br>　　　　　Counter-Defendant. | CV 23-148-BLG-SPW-TJC<br><br>**FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE** |

　　Plaintiffs Kaneisha Bird and her son O.M. ("Plaintiffs") bring this action against the United States alleging claims for negligence, negligent infliction of emotional distress, and breach of fiduciary duty arising from an incident wherein three-year-old O.M. was struck by a vehicle driven by a Bureau of Indian Affairs (BIA) officer on the Northern Cheyenne Reservation.

1

Presently before the Court is the United States' Motion to Dismiss Count Four of Plaintiffs' Second Amended Complaint. (Doc. 28.) The motion is fully briefed and ripe for the Court's review. (Docs. 35, 38.)

Having considered the parties' submissions, the Court finds the United States' Motion to Dismiss should be **GRANTED**.

I.   **BACKGROUND**[1]

In the early evening of July 1, 2022, Plaintiffs were attending a Pow Wow on the Northern Cheyenne Indian Reservation at the Kenneth Beartusk Memorial Pow Wow grounds near Lame Deer, Montana. BIA officer Richard Selva was driving a BIA vehicle at the same location. Officer Selva struck O.M. with the BIA vehicle, running him over with both the front and rear wheel, and dragging O.M. beneath the vehicle for a distance before stopping. Kaneisha Bird, O.M.'s mother, ran after and recovered O.M. from beneath the BIA vehicle, and witnessed the severe injuries sustained by O.M. Plaintiffs allege O.M.'s injuries included severe lacerations and contusions to his right thigh, right groin, left leg, intra-abdominal trauma, and head injury.

---

[1] For the purposes of this motion, the Court accepts as true the allegations contained in Plaintiffs' Complaint. *Wyler Summit P'ship v. Turner Broadcasting Sys, Inc.*, 135 F.3d 658, 661 (9th Cir. 1998).

On December 5, 2023, Plaintiffs filed this lawsuit. (Doc. 1.) Initially, Plaintiffs pled a claim for breach of fiduciary duty but removed the claim in their First Amended Complaint. (*Compare* Doc. 1 at ¶¶ 37-42; Doc. 6.) On October 10, 2024, Plaintiffs filed a Second Amended Complaint, realleging the breach of fiduciary duty claim in Count Four. (Doc. 25 at ¶¶ 37-42.)

The United States now moves to dismiss Count Four for failure to state a claim. (Doc. 28.) The United States argues Plaintiffs fail to cite a specific federal statute creating a relevant trust relationship to support the breach of fiduciary duty claim. As a result, the United States asserts Plaintiffs claim for breach of fiduciary duty must be dismissed.

## II.   LEGAL STANDARD

"Dismissal under Rule 12(b)(6) is proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." *Zixiang Li v. Kerry*, 710 F.3d 995, 999 (9th Cir. 2013) (quoting *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008)). The Court's standard of review under Rule 12(b)(6) is informed by Rule 8(a)(2), which requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677–678 (2009) (quoting Fed. R. Civ. P 8(a)).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. A plausibility determination is context specific, and courts must draw on judicial experience and common sense in evaluating a complaint. *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). A court considering a Rule 12(b)(6) motion must accept as true the allegations of the complaint and must construe those allegations in the light most favorable to the nonmoving party. *Wyler Summit P'ship*, 135 F.3d at 661.

### III.  ANALYSIS

The United States, as a sovereign, is immune from suit unless it has expressly waived its immunity and consented to suit. *United States v. Shaw*, 309 U.S. 495, 500-501 (1940); *FDIC v. Meyer*, 510 U.S. 471 (1994). In this case, Plaintiffs rely on the Federal Tort Claims Act ("FTCA") for the requisite waiver of sovereign immunity and grant of jurisdiction in this Court. The FTCA waives sovereign immunity for certain tort claims, and provides "[t]he United States shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances . . . ." 28 U.S.C. § 2674. The FTCA also grants

exclusive jurisdiction of such claims in federal district court, providing that "the district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . , for injury . . . caused by the negligent or wrongful act or omission of any employee . . . under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). The United States Supreme Court has interpreted the "law of the place," in § 1346(b), as referring to the law of the state where the act or omission occurred. *FDIC v. Meyer*, 510 U.S. 471, 478 (1994).

The parties agree that Montana law recognizes a tort action for breach of fiduciary relationship. (Docs. 35 at 7 and 38 at 3, citing *Marlys Bear Medicine v. U.S. ex rel. Sec. of Dept. of Int.*, 241 F.3d 1208, 1218-19 (9th Cir. 2001).) Thus, the FTCA's "private person" liability may extend to such a claim. The question, then, is whether there exists an actionable fiduciary relationship between Plaintiffs and the United States to support a breach of trust claim.

In the Second Amended Complaint, Plaintiffs point to the "special trust relationship" between the United States and Indian tribes and their members as giving rise to the fiduciary relationship. (*See* Doc. 25 at ¶¶ 38, 41.) There is no question that there is "general trust relationship between the United States and the Indian people." *U.S. v. Jicarilla,* 564 U.S. 162, 176 (2011) (quoting *U.S. v.*

5

*Mitchell*, 463 U.S. 206 at 225 (1983)). But this general trust relationship, alone, is not sufficient to give rise to an actionable fiduciary duty. *See Jicarilla Apache Nation*, 564 U.S. at 173-74; *U.S. v. Navajo Nation*, 537 U.S. 488, 506 (2003); *Gros Ventre Tribe v. U.S.*, 469 F.3d 801, 810 (9th Cir. 2006). As the Supreme Court has recognized, "[t]he *general* relationship between the United States and the Indian tribes is not comparable to a private trust relationship." *Jicarilla Apache Nation*, 564 U.S. at 173 (quoting *Cherokee Nation of Okla. v. U.S.*, 21 Cl. Ct. 565, 573 (1990)). Therefore, to maintain a breach of fiduciary duty claim, Plaintiffs "must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties." *Navajo Nation*, 537 U.S. at 506. A statute creating a "limited trust relationship to serve a narrow purpose" is not sufficient. *Jicarilla Apache Nation*, 564 U.S. at 176. The applicable statute must "clearly establish fiduciary obligations of the Government" in some area. *Id.* at 177.

A series of cases before the United States Supreme Court serve to illustrate the distinction between the creation of a fiduciary relationship, and a "bare" or "limited" trust relationship. First, in *U.S. v. Mitchell*, 445 U.S. 535 (1980) (*Mitchell I*), the Court considered whether the Indian General Allotment Act of 1887 created a fiduciary relationship and authorized an award of damages against the United States for alleged mismanagement of forests located on lands allotted to

6

Indians under the Act. *Id.* at 536. Under the General Allotment Act, the government had allotted all the land on the Quinault Reservation in trust to individual members of the Tribe. *Id.* at 536-37. Other enactments of Congress, however, required the Secretary of the Interior to manage the forest on the reservation, sell the timber, and pay the proceeds of the sales to the allottees. *Id.* at 537.

An action was brought by the Quinault Tribe, and individual allottees of the Tribe, for breach of a fiduciary duty owed to them by the United States as trustee of the lands allotted under the General Allotment Act. *Id.*

The Supreme Court ultimately rejected the claim, finding that although title to the property remained in the United States, the allottees retained primary responsibility for managing the land. *Id*. at 542-43. The Court found that the Act did not "unambiguously provide that the United States has undertaken full fiduciary responsibilities as to the management of the allotted lands." *Id*. at 542. Thus, "the Act created only a limited trust relationship between the United States and the allottee that does not impose any duty upon the Government to manage timber resources." *Id.*

The case was back before the Court three years later in *U.S. v. Mitchell*, 463 U.S. 206 (1983) (*Mitchell II*). On that occasion, the Court looked to a network of other regulations and statutes and found that the United States did indeed have a

7

judicially enforceable fiduciary duty to manage the forests of the allotted lands. The Court contrasted the "bare trust" created by the General Allotment Act considered in *Mitchell I*, with the statutes and regulations considered in *Mitchell II*, and found the latter gave the government "full responsibility to manage Indian resources and land for the benefit of the Indians." *Id*. at 224. Under the applicable statutes, the government exercised daily supervision over the Tribe's timber resources, and placed under federal control "[v]irtually every stage of the process." *Id*. at 222. The Court concluded that a "fiduciary relationship necessarily arises when the Government assumes such elaborate control over forests and property belonging to Indians." *Id*. at 225.

Twenty years later, the Supreme Court issued two opinions on the same date which serve to further define and delineate the parameters of a breach of trust claim: *U.S. v. Navajo Nation*, 537 U.S. 488 (2003); and *U.S. v. White Mountain Apache Tribe*, 537 U.S. 465 (2003).

In *Navajo Nation*, the Tribe brought an action alleging the government breached its trust obligations to the Tribe under the Indian Mineral Leasing Act of 1938 ("IMLA"), in connection with the Secretary of the Interior's approval of coal lease amendments negotiated by the Tribe and Peabody Coal Company. The Court examined the Tribe's claim under *Mitchell I* and *Mitchell II*, and held that the claim for compensation failed, because the claim did not "derive from any liability-

8

imposing provision of the IMLA or its implementing regulations." *Navajo Nation*, 537 U.S. at 493. The Court found that unlike *Mitchell II*, "the IMLA and its regulations do not 'give the Federal Government full responsibility to manage Indian resources . . . for the benefit of the Indians.'" *Id*. at 507 (quoting *Mitchell II*, 463 U.S. at 225). Under the IMLA, the government was "neither assigned a comprehensive managerial role nor, at the time relevant here, expressly invested with responsibility to secure 'the needs and best interests of the Indian owner and his heirs.'" *Id*. at 507-08.

The Court also pointed out that the IMLA was actually designed to "enhance tribal self-determination" by giving the Tribes the lead role in negotiating their mining leases. *Id.* at 508. The Court recognized that this "ideal of Indian self-determination is directly at odds with Secretarial control over leasing." *Id.* (quoting *Navajo Nation v. U.S.*, 46 Fed. Cl. 217, 230 (2000).

At the other end of the spectrum is the Court's decision in *White Mountain Apache Tribe*, 537 U.S. 465 (2003). There, the Tribe brought suit against the United States for not properly maintaining Fort Apache, a historic site on the Tribe's reservation. In 1960, Congress provided by statute that the fort would be held by the United States in trust for the White Mountain Apache Tribe, subject to the government's right to use the land and improvements when needed. *Id.* at 469.

9

The government exercised this right, and physically occupied approximately 30 of the post's buildings. *Id.*

The Court found these circumstances went "beyond a bare trust and permits a fair inference that the Government is subject to duties as a trustee and liable damages for breach." *Id*. at 474. The Court noted that, unlike the Allotment Act, the statute "invest[s] the United States with discretionary authority to make direct use of portions of the trust corpus." *Id*. at 475. The Court, therefore, found that the government had "not merely exercised daily supervision but has enjoyed daily occupation, and so has obtained control at least as plenary as its authority over the timber in *Mitchell II*." *Id*.

These cases illustrate that the determination of a fiduciary trust relationship must "train on specific rights-creating or duty-imposing statutory or regulatory prescriptions." *Navajo Nation*, 537 U.S. at 506. Where, as in *Mitchell II* and *White Mountain Apache Tribe*, the government is given "full responsibility to manage Indian resources and land for the benefit of the Indians," a fiduciary trust relationship may be found. *White Mountain Apache Tribe*, 537 U.S. at 474. "But the applicable statues and regulations 'establish [the] fiduciary relationship and define the contours of the United States' fiduciary responsibilities.'" *Jicarilla Apache Nation*, 564 U.S. at 177 (quoting *Mitchell II*, 463 U.S. at 224)). Conversely, when Congress only establishes a "limited trust relationship to serve a

10

narrow purpose," as it did in *Mitchell I* and *Navajo Nation*, no such relationship will be found.

In this case, Plaintiffs argue the Indian Law Enforcement Reform Act ("ILERA") 25 U.S.C. § 2802, the Tribal Law and Order Act of 2010 ("TLOA") Publ. L. No. 111-211 § 202, and the BIA Office of Justice Services ("BIA-OJS") Handbook give rise to specific fiduciary duties.

Plaintiffs do not explain, however, how the ILERA or the TLOA "unambiguously provide that the United States has undertaken full fiduciary responsibilities" for law enforcement activities on tribal lands, nor indicate that such a relationship was intended. *Mitchell I*, 445 U.S. 535 at 542. To the contrary, it appears both statutes were enacted to foster cooperation between the federal government and Indian tribes.

The ILERA, for example, requires communication and consultation with tribal leaders and tribal justice officers regarding public safety and justice concerns in Indian country. 25 U.S.C. § 2802(c)(11), (12). It further requires consent of an Indian tribe for enforcement of tribal law, and cooperation with tribal law enforcement agencies for investigating federal criminal offenses. 25 U.S.C. § 2802(c)(1), (2).

Similarly, the TLOA "generally sought to improve cooperation between federal law enforcement and tribes." *Los Coyotes Band of Cahuilla & Cupeno*

*Indians v. Jewell*, 729 F.3d 1025, 2032 (9th Cir. 2013).  Among its stated purpose is cooperation and increased "coordination and communication among Federal, State, tribal, and local law enforcement agencies."  Pub. Law 111-211, § 202(b)(2); 25 U.S.C. § 2802(c).  The TLOA further states that it is intended "to empower tribal governments with the authority, resources, and information necessary to safely and effectively provide public safety in Indian country."  Pub. Law 111-211, § 202(b)(3).  As recognized in *Navajo Nation*, the TLOA's aim to foster tribal self-determination, is inconsistent with a finding that the United States has full fiduciary responsibilities for law enforcement.  *See Navajo Nation*, 537 U.S. at 494, 508 (finding the Indian Mining Lease Act's aim to foster tribal self-determination was inconsistent with the creation of fiduciary duties).

Accordingly, courts within this circuit have determined neither the ILERA nor the TLOA impose fiduciary trust obligations on the United States.  *See e.g. Los Coyotes Band of Cahuilla & Cupeno Indians v. Salazar*, 2011 WL 5118733, *7-8 (S.D. Cal. Oct. 28, 2011) (finding the ILERA and TLOA do not confer the required specific duty on the United States to create a specific trust relationship); *Hopland Band of Pomo Indians v. Jewell*, 624 Fed. Appx. 562, 563 (9th Cir. Dec. 14, 2015) (finding nothing in the statutory language of the ILERA can reasonably be read to impose on the United States a specific fiduciary obligation).

With respect to the BIA-OJS Handbook, Plaintiffs have provided no authority to support the proposition that a fiduciary trust relationship can be created by an agency handbook. It is simply not a "trust-creating statute or regulation." *United States v. Navajo Nation*, 556 U.S. 287, 302 (2009). Additionally, the provisions of the handbook cited by Plaintiffs cannot be construed to create fiduciary obligations on the government. The handbook merely recites the BIA's policy "which emphasizes the protection of life and minimizes the risk of unnecessary injury or death to any person," and the federal policy of "valu[ing] the communities we serve." (Doc. 35 at 12.) Plainly, these provisions do not establish specific fiduciary obligations.

Moreover, Plaintiffs do not explain how this case involves a violation of any of these provisions. With respect to the ILERA, Plaintiffs point to provisions in the Act which provide that the BIA "shall be responsible for providing, or for assisting in the provision of, law enforcement services in Indian country as provided in this chapter." 28 U.S.C. § 2802(a). But Plaintiffs do not explain what law enforcement services under the statute the BIA failed to provide.

Plaintiffs also argue that the ILERA provides for the establishment of the BIA-OJS, which is charged with carrying out the law enforcement functions of the Department of the Interior in Indian Country. Again, however, Plaintiffs do not

13

allege that BIA-OJS was not established, or that the failure to perform any law enforcement services in Indian country had any causal relationship to this accident.

The same is true with respect to the TLOA, Plaintiffs point to the general recognition in the statute that the government has "distinct legal, treaty and trust obligations to provide for the public safety in Indian country." (Doc. 35 at 13.) But aside from this recognition of the existence of a general trust relationship between the government and the Indian people, Plaintiffs have not identified any specific fiduciary or other duty that the government failed to perform.

Therefore, Plaintiffs have failed to identify a source of substantive law that establishes specific fiduciary duties, or allege facts that the government has failed to perform those duties. Accordingly, the Court finds Plaintiffs' breach of fiduciary duty claim fails as a matter of law. The Court will, therefore, recommend that the United States' Motion to Dismiss Count Four be **GRANTED**.

## IV.   CONCLUSION

Based on the foregoing, **IT IS HEREBY RECOMMENDED** that the United States' Motion to Dismiss (Doc. 28) be **GRANTED**.

**NOW, THEREFORE, IT IS ORDERED** that the Clerk shall serve a copy of the Findings and Recommendations of United States Magistrate Judge upon the parties. The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court and copies

served on opposing counsel within fourteen (14) days after service hereof, or objection is waived.

**IT IS ORDERED.**

DATED this 16th day of May, 2025.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge