**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION**

|  |  |
|---|---|
| KANEISHA BIRD; O.M. (a minor),<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA, acting by and through the Bureau of Indian Affairs,<br><br>Defendant. | CV 23-148-BLG-SPW-TJC<br><br>**FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE** |

Plaintiffs Kaneisha Bird and her son O.M. ("Plaintiffs") bring this action against the United States alleging claims for negligence, negligence per se, and negligent infliction of emotional distress. The case arises from an incident wherein O.M. was struck by a vehicle driven by a Bureau of Indian Affairs ("BIA") officer on the Northern Cheyenne Reservation during the 2022 Northern Cheyenne Chief's Powwow.

Judge Watters has referred the case to the undersigned under 28 U.S.C. § 636(b)(1)(B). (Doc. 11.) Presently before the Court are Plaintiffs' Motion for Summary Judgment (Doc. 45), and the United States' Motion for Partial Summary Judgment (Doc. 51). The motions are fully briefed and ripe for the Court's review.

Having considered the parties' submissions, the Court **RECOMMENDS** Plaintiffs' Motion for Summary Judgment be **GRANTED in part and DENIED**

**in part**, and the United States' Motion for Partial Summary Judgment be

**GRANTED**, as set forth below.

## I.    BACKGROUND[1]

The Northern Cheyenne Chief's Powwow is an annual multi-day community

event held at the Kenneth Beartusk Memorial Powwow Grounds, located

approximately five miles south of Lame Deer, Montana.  In 2022, the Powwow

was scheduled from Thursday, June 30, through Tuesday, July 5.  The event draws

large crowds of tourists, families, and tribal members, and includes activities such

as a rodeo, hand game tournament, 1-mile walk/5k run, peewee basketball and

volleyball tournaments, and a kids' parade.

The BIA Northern Cheyenne Police Department traditionally provides law

enforcement services at the Powwow, including traffic control, crowd

management, and community policing.  The Powwow is one of the busiest

weekends of the year on the Reservation, and it requires additional BIA staffing to

cover both the event as well as regular patrol duties.

On Friday, July 1, 2022, Plaintiffs arrived at the Powwow at approximately

6:00 p.m.  Kaneisha testified that they planned to camp overnight in a tent on the

powwow grounds.  O.M. was three years old at the time.

---

[1] The background facts set forth here are relevant to the Court's determination of
the pending motions and are taken from the parties' submissions.

BIA Officer Richard Selva was scheduled to work the night shift on July 1, 2022, from 6:00 p.m. to 6:00 a.m. the following morning.  After beginning his shift, he drove to the Powwow grounds sometime between 8:00 and 8:30 p.m.  Officer Selva was driving a BIA-owned, 2021 Chevrolet Silverado pickup that was equipped with a forward-facing dash camera that recorded the events that evening.

The dash camera video begins with Officer Selva driving down the highway to the Powwow location.  After turning off the highway, Powwow security personnel opened an access road to allow Officer Selva to drive his BIA vehicle onto the Powwow grounds.  The access road was narrow and was lined with vehicles on both sides of the roadway for most of its length.

The dash camera video shows Officer Selva encountering several pedestrians while traveling on the access road.  Officer Selva first passed two unaccompanied children walking along the road.  He then encountered three more children walking down the center of the road.  The three children moved to the right, and Officer Selva passed them.

During this time frame, O.M. first became visible on the dash camera video.  He was standing ahead of the BIA vehicle near a square fabric tent several feet to the right side of the access road.

As Officer Selva continued driving forward, an adult woman stepped onto the left side of the access road in front of his vehicle, with another adult walking on

3

the same side of the road in the opposite direction.  Officer Selva steered slightly right to navigate around these pedestrians.

During this time, O.M. began running away from the tent toward the access road.  At least initially, O.M. remained visible on the dash camera video in front, and to the right of the patrol vehicle.  O.M. then passed behind a parked Cadillac automobile on the right side of the road for approximately 2 seconds.  When O.M. emerged from behind the Cadillac, he can again be seen on the dash camera video moving toward the access road in front, and to the right of Officer Selva's patrol vehicle.  As he approached the roadway, O.M. briefly paused before moving onto the roadway in the path of Officer Silva's vehicle.

Officer Silva hit O.M. with the front of his patrol vehicle, driving over O.M. with both the front and rear right-side tires.  Officer Selva stopped the vehicle approximately three seconds after the initial impact when he felt two bumps from his vehicle's right tires driving over O.M.'s body.

O.M.'s mother, Kaneisha is visible on the dash camera video in the background with her other child.  Kaneisha turned and witnessed the vehicle strike O.M. with its front grill guard, and then continue forward, running over O.M. Kaneisha immediately picked up O.M. and carried him to the EMT tent.  O.M. was bleeding from his head, and his clothing had to be cut away to assess his lower body injuries.  Due to the unavailability of a helicopter, O.M. was transported by

4

ambulance to Indian Health Services ("IHS") in Lame Deer.  He was later transported to another IHS facility in Crow Agency, Montana, and then to a hospital in Billings, Montana.

Fortunately, O.M. did not sustain life-threatening injuries.  Nevertheless, O.M. was hospitalized for approximately 4 days, and underwent imaging, treatment, and surgical repair of a laceration to his right groin/thigh.  After his discharge, however, O.M.'s wound became infected, requiring skin graft surgery and subsequent hospitalization for an additional 16 days.

Officer Selva testified that he was driving around 4-5 miles per hour prior to the accident, and that he did not see O.M. at any point prior to striking him with his patrol vehicle.  He stated that to his best recollection, he was looking at the road ahead while he was driving.  He stated he was not on his cell phone, and he was not looking at other screens in his vehicle.

Plaintiffs' expert, Greg Gravesen, provided an expert report opining that the cause of the collision was Officer Selva's failure to maintain a proper lookout and failure to yield the right-of-way to a pedestrian. (Doc. 49-9.)  Mr. Gravesen conducted a frame-by-frame video analysis of the dash camera footage, and concluded that O.M. was able to be seen from the BIA vehicle for approximately 11.7 seconds before he was struck by the vehicle.  (*Id.* at 4, 6.)  He further concluded that 3.93 seconds elapsed from the point where O.M. reappeared from

behind the parked Cadillac to impact.  (*Id.* at 4.)  Based on this analysis, Mr. Gravesen stated that "there is nothing that would have prevented the driver of the Chevrolet from seeing [O.M.] prior to the collision."  (*Id.*)

Mr. Gravesen further reports that Officer Selva was alerted to the presence of both pedestrians and children on the service road, and thus he should have increased his attentiveness for detecting children and driven in a manner consistent with driving in a school zone.  (*Id.* at 6.)  He concluded that Officer Selva's driving conduct was not consistent with safe driving practices outlined in the Montana Driver's Manual and violated basic visual scanning and hazard detection standards. (*Id.*)

The United States' expert, Carla Werder, provided an expert report in which she likewise analyzed the dash camera video.  (Doc. 49-10 at 5-6.)  Ms. Werder also included information in her report about the BIA vehicle Officer Selva was driving.  (*Id.* at 6-7.)  Ms. Werder reports that the view of the dash camera video from the BIA vehicle is not the same as the view of the driver of the BIA vehicle. (*Id.* at 9.)  She explained that the dash camera in the BIA vehicle was mounted to right of the rearview mirror and was positioned further forward than the driver. (Id.)  She also states that the dash camera's view was not blocked by A-pillars or the dashboard of the vehicle.  (*Id.*)  In her rebuttal report, Ms. Werder further explained that a typical dash camera's field of vision is significantly wider than a

driver's field of vision. Doc. 59-1 at 6.)    Therefore, she concludes that the dash camera's field of view, unobstructed by the dash and other interior features, shows substantially more of the area in front of and to the right of the vehicle, than the driver's view.  (*Id.* at 7.)  Ms. Werder also said that Officer Selva's view of O.M. outside the right front of his vehicle would have been at least partially blocked by the right A-pillar.  (Doc. 49-10 at 9.)  She, therefore, concludes that Officer Selva's statement that he never saw O.M. before the accident was consistent with his view of the child being blocked by the A-pillar.  (*Id.*)

Ms. Werder's also analyzed whether Officer Selva could have avoided the impact with O.M.  (*Id.*)  In this regard, Ms. Werder agreed that Officer Selva "could have detected the child as soon as the child appeared from behind the Cadillac."  (*Id.*)  Nevertheless, she does not believe that O.M. became a "conspicuous hazard" until he either started running toward the access road or until he crossed onto the road.  (*Id.*)  Based on the video analysis, "Driver Response Time" research and simulation data, and the use of "Interactive Driver Response Research" software, Ms. Werder concluded that Officer Selva had less than 1 second to perceive the running child as a hazard and begin responding.  (*Id.* at 10-11.)  She opined that this indicates Officer Selva did not have enough time to perceive and respond to O.M. running onto the road and into the path of his vehicle.  (*Id.* at 11.)

With respect to the claim that Officer Selva did not exercise due caution for pedestrians, Ms. Werder opined that her analysis of the dash camera video shows Officer Selva was aware of pedestrians and was exercising caution because he slowed as he passed the pedestrians.  (*Id.* at 9.)

## II.   DISCUSSION

### A.   Legal Standard

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Material facts are those which may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable fact-finder to return a verdict for the nonmoving party.  *Id*.

The party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  When making this determination, the Court must view all inferences drawn from the underlying facts in the light most favorable to the non-moving

party.  *See Matsushita*, 475 U.S. at 587.  "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment."  *Anderson*, 477 U.S. at 255.

### B.   Plaintiffs' Motion for Summary Judgment

Plaintiffs move for summary judgment on two grounds: (1) that Officer Selva was negligent per se under Montana law; and (2) that O.M., as a three-year-old child, cannot be found negligent as a matter of law.  (Doc. 45.)

The United States counters that the undisputed facts prove Officer Selva was not negligent per se.  But even if Officer Selva was negligence, the United States argues that Kaneisha's share of negligence in failing to supervise O.M. was more than fifty percent, barring Plaintiffs' recovery.  The United States, therefore, asserts the Court should grant summary judgment in its favor.

### 1.   Whether Officer Selva was Negligent Per Se

Plaintiffs argue the undisputed facts demonstrate that O.M. was in plain view, and Officer Selva was negligent per se for failing to maintain a proper lookout as required by Montana law and avoid hitting him.  Plaintiffs further assert that Officer Selva was negligent per se for failure to use proper precautions for pedestrians, including using proper precaution upon observing a child on a roadway, as required by Mont. Code Ann. § 61-8-504.

9

The United States counters that Officer Selva exercised due care.  The United States argues that its expert opinion testimony shows Officer Selva had less than one second to recognize that O.M. was a threat and respond, and therefore, he was not negligent as a matter of law.

Summary judgment is generally inappropriate in negligence cases because of the prevalence of factual issues.  *Peterson v. Eichhorn*, 189 P.3d 615, 621 (2008).  "However, summary judgment may be appropriate when reasonable minds 'could not draw different conclusions from the evidence.'" *Walden v. Yellowstone Elec. Co.*, 487 P.3d 1, 6 (2021) (citing *Larchick v. Diocese of Great Falls-Billings*, 208 P.3d 836, 857 (2009)).

"Negligence per se is simply '[n]egligence established as a matter of law,' and it usually 'arises from a statutory violation.'"  *Giambra v. Kelsey*, 162 P.3d 134, 144 (Mont. 2007).  The effect of negligence per se "is to stamp the defendant's conduct as negligence, with all the effects of common law negligence, but with no greater effect."  *Id.*  Thus, questions such as "the causal relationship between the violation and the harm to the plaintiff, and in the ordinary case *the defenses of contributory negligence*, and assumption of the risk" remain open.  *Id.* (emphasis in original).

Plaintiffs argue Officer Selva was negligent per se because O.M. was clearly visible for numerous seconds before impact, and if Officer Selva had maintained a

proper lookout, he would not have struck O.M.  Plaintiffs assert that "[a]nyone watching the dashcam video will agree that O.M. was readily visible and detectable as a matter of commons sense."  (Doc. 46 at 15.)

The United States does not dispute that O.M. can be seen on the dash camera video.  The United States contends, however, that the configuration of the BIA vehicle and dash camera supports its theory that Officer Selva did not see O.M. until it was too late to respond.  The United States cites Ms. Werder's expert report that explains the dash camera view is not the same as the driver's view, and the A-pillar and dashboard would have obstructed the driver's view.  The United States also relies on Ms. Werder's opinion Officer Selva did not have sufficient response time to avoid striking O.M.

The parties also dispute whether Officer Selva was exercising due care for pedestrians.  Plaintiffs' expert indicates Officer Selva was on notice that unaccompanied children were present, which triggered a heightened duty to anticipate erratic behavior by children, and his failure to yield the right-of-way to the pedestrian was a direct cause of the collision.

The United States counters with its expert testimony that a time and distance analysis of the dash camera video shows Officer Selva slowed as he passed the first pedestrians, indicating he was exercising caution and due care.

In responding to the United States' arguments, Plaintiffs argue that the opinion of the United States' expert does not create a genuine issue of material fact. Plaintiffs assert several arguments attacking the credibility of Ms. Werder's opinions, such as the fact she did not inspect the BIA vehicle or visit the scene of the accident, and that she speculates where Officer Selva was looking as he was driving. The trier of fact may ultimately find these arguments persuasive, but they go to the weight of the testimony, not to its admissibility.

The trial court acts as a gatekeeper by excluding expert evidence that does not meet standards of relevance and reliability. *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014). "The relevancy bar is low, demanding only that the evidence 'logically advances a material aspect of the proposing party's case.'" *Id.* (quoting *Daubert v. Merrell Dow Pharm.*, 43 F.3d 1311, 1315 (9th Cir. 1995)). Expert opinion testimony "is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010). The Court should screen out "unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car Inv. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not

exclusion." *Primiano*, 598 F.3d at 564.  *See also Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1017 n. 14 (9th Cir. 2004).

Here, Plaintiffs have not directly sought to exclude the testimony of Ms. Werder, and the Court cannot conclude based on the record presented that her proposed testimony does not meet the threshold requirements of relevance and reliability.  Ms. Werder reached her conclusions regarding the accident after conducting an analysis of the dash camera video, reviewing photographs, considering an exemplar vehicle, reading official investigation reports and witness statements, and analyzing the accident using "Driver Response Time" research and "Interactive Driver Response Research" software.  Therefore, whether the factual basis for Ms. Werder's opinions is supported by the evidence, and whether the assumptions she relied upon to form her opinions are valid, are proper subjects for cross-examination.  *See Alaska Rent -A-Car Inv.*, 738 F.3d at 969.

The Court finds this case, like most negligence cases, should be assessed by the trier of fact.  Plaintiffs will offer the dash camera video that provides compelling evidence as to how this accident occurred.  The United States, in turn, will offer testimony that may provide additional context to the dash camera video – namely that it does not necessarily reflect the same view that the driver would have had.

Additionally, whether the accident could have been avoided is disputed by the parties' experts. Plaintiffs' expert is expected to testify that Officer Selva had adequate opportunity to see O.M. and avoid striking him if he had kept a proper lookout, and the United States' expert will offer the opposite conclusion. These are factual disputes that are for the trier of fact to resolve. *See Wood v. Old Trapper Taxi*, 952 P.2d 1375, 1381 (Mont. 1997) ("Juries have an uncanny ability to evaluate the credibility of a witness, especially an expert. Problems presented in a case such as this, namely conflicting expert testimony . . . are best solved by juries.") Judge Watters, as the trier of fact, is certainly in the best position to make those evaluations at trial.

Accordingly, the Court finds there are genuine disputes of material fact as to whether Officer Selva was negligent per se. Accordingly, Plaintiffs' Motion for Summary Judgment on the basis of negligence per se should be denied.

### 2.    Comparative Negligence of O.M.

Plaintiffs next argue that O.M., as a three-year-old child, is legally incapable of being held negligent, citing *Graham v. Rolandson*, 435 P.2d 263, 267 (Mont. 1967) ("It has long been the law of Montana that a child under seven years of age cannot be contributorily negligent as a matter of law."). The United States concedes that O.M. cannot be held comparatively negligent for his own conduct as

a matter of law.  Therefore, Plaintiffs' motion for summary judgment should be granted as to the United States' defense of comparative negligence as to O.M.

The United States argues, however, that O.M.'s mother, Kaneisha, was more than fifty percent negligent in failing to supervise and care for O.M.  Therefore, the United States maintains, without explanation, that neither plaintiff can recover against the United States.  It appears that the United States assumes that Kaneisha's negligence, if any, will be imputed to O.M.  The United States cites no authority to support that proposition, and it is not an accurate application of Montana law.

If, as the United States argues, Kaneisha is found to have been negligent, *her* recovery will either be proportionately reduced or barred under Montana's comparative negligence statute.  *See* Mont. Code Ann. § 27-1-702.  Additionally, the apportionment of negligence between Kaneisha and the United States may determine whether the United States is jointly and severally liable, or only severally liable, under Montana's apportionment statute.  *See* Mont. Code Ann. § 27-1-703(2).  But there is no provision under either Montana's comparative negligence or apportionment statutes that would operate to impute Kaneisha's negligence to O.M.  Therefore, even if Kaneisha is determined to have been negligent, her negligence would not preclude recovery by O.M.

Further, the determination of any negligence on the part of Kaneisha presents a question for the trier of fact. *See Pierce v. ALSC Architects, P.S.*, 890 P.2d 1254, 1260 (1995) ("[E]ven when a defendant is negligent as a matter of law, the issue of contributory negligence on the part of the plaintiff and the degree of comparative negligence, if any, is normally an issue for the jury or fact finder to resolve."); *Okland v. Wolf*, 258 Mont. 35, 42, 850 P.2d 302, 306-07 (1993) (holding that "where there was evidence of negligence on the part of both parties, it was for the fact finder to determine the comparative degree of negligence."). Here, the parties have presented evidence of negligence on the part of both Officer Selva and Kaneisha. The determination of negligence and the apportionment of negligence should be determined by Judge Watters as the trier of fact.

In sum, the Court finds there are genuine issues of material fact as to whether Officer Selva was negligent per se and whether Kaneisha was also negligent. The parties do not dispute, however, that O.M. may not be negligent under Montana law. Accordingly, Plaintiff's Motion for Summary Judgment should be denied as to Officer Selva's negligence per se, and granted as to the contributory negligence of O.M. Further, to the extent the United States requests summary judgment as the non-moving party, the request should be denied.

/ / /

/ / /

### C.   The United States' Motion for Partial Summary Judgment

The United States moves for summary judgment on Plaintiffs' standalone claim for negligent infliction of emotional distress in Count Three of the Second Amended Complaint.  The United States argues the claim fails because there is no evidence Kaneisha or O.M. experienced the degree of serious or severe emotional distress necessary to support such a claim.

The seminal case under Montana law establishing an independent cause of action for negligent infliction of emotional distress is *Sacco v. High Country Ind. Press, Inc.*, 896 P.2d 411, 426 (Mont. 1995).  *Sacco* recognized an independent cause of action for infliction of emotional distress "under circumstances where serious or severe emotional distress to the plaintiff was the reasonably foreseeable consequence of the defendant's negligent act or omission[.]"  *Id.* at 426.  "To constitute 'serious' or 'severe,' the emotional distress must be 'so severe no reasonable person could be expected to endure it.'"  *Feller v. First Interstate Bancsystem, Inc.*, 299 P.3d 338, 344 (Mont. 2013).  The question of whether the threshold level of emotional distress can be found is for the Court to determine. *Sacco*, 896 P.2d at 425 ("It is for the court to determine whether on the evidence severe [serious] emotional distress can be found; it is for the jury to determine whether, on the evidence, it has in fact existed.") (*quoting* Restatement (Second) of Torts, § 46, comment j at 78).

The Montana Supreme Court has pointed to several factors for determining whether there is sufficient evidence of severe emotional distress, including: (1) whether the plaintiff had any physical manifestations of emotional distress; (2) whether counseling was sought or recommended; (3) whether the plaintiff took medication or the use of medication dramatically increased; (4) whether the plaintiff had continuous nights of sleeplessness or days without appetite; (5) whether the plaintiff maintained close relationships with family members and friends; (6) the intensity and duration of the emotional distress; and (7) the circumstances under which the infliction incurred, including whether the plaintiff witnessed a distressing event. *Feller*, 299 P.3d at 345.

Whether the emotional distress was the reasonably foreseeable consequence of the defendant's negligence is determined by considering factors such as: (1) the closeness of the relationship between the plaintiff and victim; (2) age of the victim; (3) the severity of the injury to the victim; and (4) whether the plaintiff was a bystander to the accident. *Wages v. First Nat'l Ins. Co. of Am.*, 79 P.3d 1095, 1100 (Mont. 2003). To reach the foreseeability question, however, it must be established that the emotional distress is serious or severe. *Schurg v. United States*, 584 F.Supp.3d 893, 913 (D. Mont. 2022).

Here, the United States does not dispute the foreseeability requirement of the *Sacco* analysis. Rather, the United States argues Plaintiffs cannot establish the required seriousness or severity of their alleged emotional distress.

Upon consideration of the *Feller* factors, the Court finds Plaintiffs' emotional distress does not rise to the level where severe emotional distress may be found. Neither Kaneisha nor O.M. have any documented physical manifestations of emotional distress. Kaniesha states in her declaration that O.M. was fearful of cars after the accident, and that he developed behavioral changes and often acted "mean." (Doc. 63 at ¶¶ 9, 11.) There is no evidence, however, that O.M. has needed counseling or that it was ever recommended. Likewise, Kaneisha has not sought counseling. Kaneisha testified at her deposition that she never talked to a counselor or therapist because, in her own words, "I know one of these days I was going to be okay. I was going to – I know I was going to be okay. As long as I didn't talk about it or nobody didn't bring it up, I know I was going to be okay." (Doc. 64-2 at 20.) Kaneisha's statements that she knew she would "be okay" reveal "a philosophical strength that would likely be absent in a case of severe emotional distress." *Renville v. Fredrickson*, 101 P.3d 773, 777 (Mont. 2004).

Further, neither Kaneisha nor O.M. have required any medications beyond Kaneisha giving O.M. a children's Tylenol on occasion. (Doc. 64-2 at 20.) There is no indication O.M. suffered sleeplessness or lack of appetite. Kaneisha did

testify, however, that after the accident she "couldn't sleep because, like it's just, like, a flashback like it just happened." (*Id.*)  In her declaration she states her sleeplessness and flashbacks continued for at least six months.  (Doc. 63 at ¶ 5.)

With regard to Plaintiffs' ability to maintain relationships, there is evidence their family relationships were impacted for a time following the accident. Kaneisha stated in her declaration that she used alcohol in unhealthy ways, both before and after the accident, and was arrested for DUI in November 2022.  (Doc. 63 at ¶ 7.)  As a result, she was incarcerated for approximately 4 months and lost custody of her children.  (Doc. 64-2 at 19.)  Nevertheless, following her incarceration, Plaintiff completed alcohol classes, a 15-day recovery program, parenting classes, and has maintained sobriety.  (Doc. 64-2 at 2, 20-21.)  Plaintiff also regained custody of her children and has since remarried.  (*Id.* at 3; Doc. 53-1 at 3.)

As to the circumstances under which the emotional infliction incurred, Kaneisha directly witnessed seeing her child hit by Officer Selva's vehicle.  There is little question that Kaneisha would have experienced distress as a result. Nevertheless, taken as a whole, the evidence does not show that her emotional distress was so serious or severe that "no reasonable person could be expected to endure it."  *Feller*, 299 P.3d at 344.  As this district has noted, a parent's feelings of being worried, concerned, and emotional upon thinking their child's accident

"are reactions 'experienced by countless parents every year' when their child is injured." *Stamey v. Winter Sports, Inc.*, 2006 WL 8435861, *4 (D. Mont. Dec. 5, 2006) (citing *Renville*, 101 P.3d 777). The Court, therefore, finds that there is insufficient evidence of serious or severity to support Plaintiffs' independent claim for negligent infliction of emotional distress.

Plaintiffs argue at length, however, that they are not required to satisfy *Sacco's* serious or severe emotional distress requirement. Plaintiffs rely instead on *Versland v. Caron Transport,* 671 P.2d 583 (1983), a case decided by the Montana Supreme Court 12 years prior to its decision in *Sacco*. In *Versland*, the Montana Supreme Court recognized an independent action for infliction of emotional distress based on a bystander theory of recovery. Under *Versland*, a claim for negligence infliction of emotional distress could be established by showing:

> 1. The shock must result from a direct emotional impact upon the plaintiff from the sensory and contemporaneous perception of the accident, as contrasted with learning of the accident from others after its occurrence.
>
> 2. The plaintiff and victim must be closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship.
>
> 3. Either death or serious physical injury of the victim must have occurred as a result of the defendant's negligence.

*Versland*, 671 P.2d at 588.

21

Plaintiffs argue that Kaneisha's claim is squarely within the *Versland* rule. She witnessed O.M.'s accident, O.M. is her son, and he sustained serious physical injury. The United States responds that *Versland* was abrogated by the Court's subsequent decision in *Sacco*, and it no longer provides a viable claim for relief. The Court agrees with the United States.

The Montana Supreme Court in *Sacco* traced the development of the claim of negligent infliction of emotional distress in Montana from 1885 through its decision in 1995. *Sacco*, 896 P.2d at 419-25. This included a discussion of the bystander rule and its decision in *Versland*. *Id.* at 422-23. The Court concluded that the course of its decisions "demonstrates that negligent infliction of emotional distress as an independent tort action is a thorny issue with which this Court has struggled." *Id.* at 424. The Court thus concluded that it was "appropriate to clarify the existing law" and to "delineate a better approach to such claims" *Id*. at 425. In doing so, the Court expressly recognized that the "narrow *Versland* analysis is archaic and does not fully address all plaintiffs who are deserving of relief." *Id.* Accordingly, the Court adopted the requirements discussed above, and recognized a cause of action for negligent infliction of emotional distress where (1) serious or severe emotional distress exists, and (2) it was a reasonably foreseeable consequence of the defendant's negligent act or omission. *Id.*

Also, contrary to Plaintiffs' argument, the Montana Supreme Court has made it clear that it intended to chart a new course in *Sacco* and did not intend to leave *Versland* and other previous avenues of relief intact.  Soon after the *Sacco* decision, the Court provided clarification of this issue in *Treichel v. State Farm Mut. Auto. Ins. Co.*, 930 P.2d 661 (Mont. 1997).  There, in seeking an insurance coverage determination, the parties stipulated that the plaintiff met all the elements of a claim for negligent infliction of emotional distress under *Versland*.  *Id.* at 663.  On appeal to the Montana Supreme Court, however, the Court made clear that *Versland* was not controlling.  The Court said its intention in *Sacco* was "to simplify and clarify the elements of claims for negligent and intentional infliction of emotional distress, not to further complicate this body of law by adding yet another theory to those already in existence."  *Id.* at 664.  The Court went on to say that "in clarifying the elements of a claim for negligent infliction of emotional distress in *Sacco*, we eliminated the other various sorts of theories by which independent torts of negligent infliction of emotional distress came into Montana law such as the *Versland* bystander analysis."  *Id.*

Later, in *Wages v. First Nat. Ins. Co. of Am.*, 79 P.3d 1095 (Mont. 2003), the defendant attempted to assert the *Versland* bystander requirement as a prerequisite to recovery in a claim for negligent infliction of emotional distress.  But the Court repeated its statement in *Sacco* that the *Versland* analysis was "archaic," and said

23

"we expressly overruled *Versland* and other 'prior cases dealing with independent causes of action involving negligent of intentional infliction of emotional distress, to the extent [such cases are] inconsistent with this opinion.'" *Id.* at 1098 (quoting *Sacco*, 896 P.2d at 429).

Therefore, it is clear that the *Sacco* analysis of claims for negligent infliction of emotional distress applies here, not the antiquated bystander analysis in *Versland*. Since Plaintiffs cannot establish the serious or severe emotional distress requirement of *Sacco*, summary judgment as to Count Three of the Second Amended Complaint should be granted.

The Court notes, however, that this conclusion does not necessarily prevent Plaintiffs from seeking emotional distress damages associated with their negligence claims. *See Jacobsen v. Allstate Ins. Co.,* 215 P.3d 649, 664 (Mont. 2009). The heightened standard of proof established in *Sacco* "applies only to independent causes of action for infliction of emotional distress, and not to emotional distress claimed as an element of damage arising from a different cause of action (sometimes called 'parasitic claims' for emotional distress)." *White v. Longley,* 244 P.3d 753, 762-63 (Mont. 2010) (explaining that for parasitic emotional distress damages, "the severity of the distress affects the amount of damages recovered but not the underlying entitlement to recover").

Accordingly, the United States' Motion for Partial Summary Judgment as to Count Three should be granted.

## III.   CONCLUSION

Based on the foregoing, **IT IS RECOMMENDED** that:

1.   Plaintiffs' Motion for Summary Judgment (Doc. 45) be **GRANTED in part, and DENIED in part**.

2.   The United States' Motion for Partial Summary Judgment (Doc. 51) be **GRANTED**.

**NOW, THEREFORE, IT IS ORDERED** that the Clerk shall serve a copy of the Findings and Recommendations of United States Magistrate Judge upon the parties.  The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after service hereof, or objection is waived.

**IT IS ORDERED**.

DATED this 10th day of February, 2026.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge